IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DEBORAH MAE TODD-SMITH                                        PLAINTIFF

V.                                        NO. 11-2029

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration            DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Deborah Mae Todd-Smith, brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claim for supplemental security income (SSI) benefits under the

provisions of Title XVI of the Social Security Act (Act).  In this judicial review, the Court must

determine whether there is substantial evidence in the administrative record to support the

Commissioner's decision.  See 42 U.S.C. § 405(g).

## I.      Procedural Background:

Plaintiff protectively filed her current application for SSI on January 29, 2007, alleging

an inability to work since January 1, 1997, due to "Spinal problems, back, legs, knees and toe

problems." (Tr. 109, 112).  An administrative hearing was held on November 18, 2008, at which

Plaintiff appeared with counsel and testified.  (Tr. 4-42).

By written decision dated March 5, 2009, the ALJ found that Plaintiff had an impairment

or combination of impairments that were severe - degenerative disc disease of the lumbar spine.

(Tr. 52).  However, after reviewing all of the evidence presented, she determined that Plaintiff's

impairments did not meet or equal the level of severity of any impairment listed in the Listing

-1-

of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 52).  The ALJ found

Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 416.967(b) except the claimant has frequent postural limitations and cannot climb ladders, ropes, or scaffolds and should have only occasional exposure to workplace hazards.  The claimant should have no exposure to airborne irritants and should never work at heights.  She should not have transactional interaction with the public.

(Tr. 53).[1]  With the help of a vocational expert (VE), the ALJ determined Plaintiff could perform

other work as a machine tender, assembler, or poultry worker.  (Tr. 55).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

denied that request on January 20, 2011.  (Tr. 1-3).  Subsequently, Plaintiff filed this action.

(Doc. 1).  This case is before the undersigned pursuant to the consent of the parties.  (Doc. 5).

Both parties have filed appeal briefs, and the case is now ready for decision.  (Docs. 11, 12).

## II.   Evidence Presented:

Plaintiff was born in 1959, completed the 10th grade of school, and never received a

GED.[2]   As background information, the records contained in the transcript date back to

September 17, 1997, and between then and the date of the hearing, November 18, 2008, Plaintiff

was involved in three altercations - one in 1997, 1999, and 2008.  (Tr. 313-315, 323-327, 466-

486).  Plaintiff also had three back surgeries - one in 1998 and two in 1999.  (Tr. 292, 301-302,

304-305, 309).  She was also involved in two motor vehicle accidents - one in 2001 and another

---

[1]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though he weight lifted may be very little, a job is in this category which it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

[2]Although the ALJ stated that Plaintiff received her GED, Plaintiff testified at the hearing that she never received a GED.  (Tr. 8).

-2-

in 2005.  In addition, in 2003, Plaintiff was walking beside a car and was hit.  (Tr. 273-283, 416-423).

Plaintiff had issues with her back beginning on September 17, 1997 (Tr. 328), and on January 8, 1998, the impression of the MRI of her lumbar spine revealed:

> 1.  Left L5-S1 disc protrusion/herniation into the left lateral recess and left foramen.  It may actually contact the left L5 nerve root as it exits the foramen, as well the L5 nerve root in the lateral recess.  Clinical correlation recommended.
> 2.  Mild annular bulge L4-L5 without significant central stenosis.

(Tr. 321-322).  In a letter dated January 12, 1998, Dr. Jonathan Brewer wrote a letter "To Whom It May Concern" wherein he stated that Plaintiff had a recent injury which had worsened, as confirmed by a repeat MRI, and that she would be unable to work.  (Tr. 305).  He also stated that Plaintiff would see a neurosurgeon that Friday, so she would need to be off work through then, when the neurosurgeon would then dictate her status after that day.  (Tr. 305).

On May 8, 1998, Plaintiff was seen by Dr. Joseph W. Queeney, a neurosurgeon at Cooper Clinic Neurosurgery.  Once Dr. Queeney reviewed the MRI scan of January 8, 1998, he recommended obtaining a myelogram with post melographic CT scan.  (Tr. 330).  Dr. Queeney performed a left L5-S1 microlaminotomy and microdiskectomy on October 2, 1998.  (Tr. 301).  One month after the surgery, Dr. Queeney reported that Plaintiff had been doing quite well and was not really having much in the way of radicular pain.  (Tr. 243).  She could lift about 20 pounds and gradually increase this over the next several months.  (Tr. 243).

On January 6, 1999, Plaintiff complained to Dr. Queeney of a sudden onset of left lower extremity pain, primarily located in the left gluteal region and left calf.  She also had some aching in the plantar aspect of her left foot and had paresthesias involving the lateral toes.  (Tr.

-3-

247).  A second surgery was performed by Dr. Queeney in January of 1999, when he performed

a left L4-S1 microlaminotomy, microdiskectomy and re-exploration microdisckectomy.  (Tr.

292, 304).   On February 11, 1999, Dr. Queeney released Plaintiff back to her primary care

physician.  (Tr. 251).  According to a report of  Dr. Jerry Lenington, of Sparks Regional Medical

Center Pain Clinic, Plaintiff reported having another back surgery in August of 1999.  (Tr. 309).

Plaintiff began seeing Dr. Lenington for pain management on December 22, 1999.  (Tr.

309-310).  Dr. Lenington reported that since Plaintiff's back surgeries and presently, Plaintiff

reported having low back pain and pain down the posterior and posterolateral aspect of her left

leg, with numbness and burning in her foot.   (Tr. 309).  He reported that her gait was antalgic,

but that she could walk on her heels and toes without any particular problems.  (Tr. 310).  Dr.

Lenington diagnosed Plaintiff with radicular pain L5-S1 left side, secondary to post laminectomy

pain syndrome.  (Tr. 310).  On January 25, 2000, Dr. Lenington reported that he had done one

lumbar epidural steroid injection on Plaintiff, that she had improved, and he gave her another one

that day.  (Tr. 307).

On June 19, 2001, Plaintiff reported slipping on a wet floor.  X-rays of her left knee

revealed a mild spurring in the patellofemoral joint, with no other osseous or joint abnormalities

being seen.  (Tr. 426).  X-rays of her cervical spine revealed a disc space narrowing at the C5-C6

level with hypertrophic spurring.  The spurs encroached on the neural foraminal bilaterally at the

C5-C6 level, and no fractures or other osseous abnormalities were seen.  (Tr. 426).  No osseous

or joint abnormalities were seen in the right shoulder or right wrist.  (Tr. 426).  X-rays of her

lumbar spine revealed a disc space narrowing at the L5-S1 level with hypertrophic spurring and

-4-

bony eburnation,[3] but no other osseous or joint abnormalites were seen.  The upper four disc spaces had a normal appearance, and it was reported that the degenerative disc disease at the L5-S1 level had progressed significantly when compared with films of 1998.  (Tr. 426).

On July 27, 2001, Plaintiff presented herself to St. Edward Mercy Medical Center, complaining of back pain radiating into her left arm.  (Tr. 283).  She had been in a motor vehicle accident a week prior thereto, and was assessed with musculoskeletal injury of her left shoulder. (Tr. 283).

On September 28, 2003, Plaintiff presented herself to Sparks Regional Medical Center, reporting that she had been hit by a car and was suffering from severe back pain.  (Tr. 416).  X-rays revealed no fracture in her right tibia and fibula or right shoulder, and three views of her lumbar spine revealed advanced disc degenerative changes at L5-S1, with mild scoliosis, and no change since June 19, 2001.  (Tr. 420).  No osseous abnormality or fracture was reported in her pelvis or right femur.  (Tr. 421-422).

On November 25, 2003, Plaintiff had a MRI of her right knee as a result of a trauma to her right knee from a fall.  (Tr. 414).  The diagnosis was leg pain, probably secondary to degenerative disc disease.  (Tr. 415).

On February 5, 2005, Plaintiff was involved in another motor vehicle accident and presented herself to St. Edward Mercy Medical Center.  (Tr. 273-280).  She was assessed with:

1. Motor vehicle accident
2. Cerebral concussion
3. Hematoma of the scalp

---

[3]Eburnation - The conversion of a bone into an ivory-like mass.  In osteoarthritis, the thinning and loss of the articular cartilage resulting in exposure of the subchondral bone, which becomes denser and the surface of which becomes worn and polished.  Dorland's Illustrated Medical Dictionary 593 (31st ed. 2007).

    4.  Contusion of the right and left knee
    5.  Contusion and abrasion of the left wrist

(Tr. 280).

On January 5, 2006, Plaintiff saw Dr. Terry Hoyt, of the Van Buren Family Clinic.  She complained of "ankles swelling," and wanted a home health aide to help with her housework. Dr. Hoyt assessed Plaintiff with fibromyalgia and post traumatic stress disorder (PTSD).  (Tr. 153).   On February 28, 2006, Plaintiff reported to Dr. Hoyt that she wanted a gynecological consult, and told Dr. Hoyt that she had several people die in her family in the previous couple of months and that her niece-in-law was sent to prison.  (Tr. 152).  She was very stressed, had fever blisters, panic attacks, crying spells, and bad dreams. (Tr. 152). Dr. Hoyt assessed Plaintiff with:

    1.  Acute and chronic ankle spasms
    2.  GERD
    3.  Rhinosinusitis
    4.  DVB[4]
    5.  CT strain with SD[5]
    6.  H. Simplex I
    7.  Sciatia

(Tr. 152).   On April 11, 2006, Plaintiff saw Dr. Hoyt for follow up.  He reported that Zanaflex helped a lot with her spasms and helped her sleep. (Tr. 151).  She was still having recurrent back pain. (Tr. 151).  She was also reported as weighing 191 pounds.  Dr. Hoyt assessed Plaintiff with myofascitis[6]/fibromyalgia, and GAD(generalized anxiety disorder)/PTSD.  (Tr. 151).  On May

---

[4]The Court is unsure of what this acronym means.

[5]The Court is unsure of what this acronym means.

[6]Myofascitis -Inflammation of a muscle and its fascia, particularly of the fascial insertion of muscle to bone.  Id. at 1241.

22, 2006, Plaintiff presented herself to Dr. Hoyt for follow up and was having recurrent swelling and soreness of her ankle.  (Tr. 150).  He assessed her with: GAD/PTSD; fibromyalgia; and effusion/left ankle.  (Tr. 150).  Plaintiff next presented herself to Dr. Hoyt on November 13, 2006, complaining of having trouble with her medications.  She also reported she had been off Paxil.  (Tr. 149).  She reported that she was grieving over the death of her boyfriend, which occurred the previous Friday, and was not sleeping well.  She also complained that her knees and ankles hurt.  (Tr. 149).  Dr. Hoyt assessed her with: GERD(gastroesophogeal reflux disease); grief reaction; GAD; and DA (degenerative arthritis)  of spine/knees/ankles.  He directed Plaintiff to restart Paxil, and prescribed other medications as well.  (Tr. 149).

On January 9, 2007, Dr. Hoyt assessed Plaintiff with:  anxiety/depression;  allergic rhinitis;  grief reaction; and DA of spine/knees.  (Tr. 184).   On February 12, 2007, Dr. Hoyt assessed Plaintiff with: anxiety/depression; fatigue; possible exposure to hepatitis; and DA of spine/knees/ankles.  (Tr. 183).

On February 23, 2007, Dr. Hoyt completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  (Tr. 161-162).  He found Plaintiff had a "Fair" ability to do certain things, and had "Poor" ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual.  (Tr. 161).  He reported that Plaintiff's chronic anxiety/depression and post traumatic stress disorder supported the assessment. (Tr. 162).

Dr. Hoyt also prepared a Medical Source Statement of Ability to do Work-Related Activities (Physical) on February 23, 2007.  (Tr. 163-165).  In the statement, he diagnosed

-7-

Plaintiff with degenerative arthritis of the spine.  (Tr. 163).  Dr. Hoyt reported that Plaintiff could: sit continuously for 1 hour before alternating postures, standing, or walking about;  sit for 5 hours during an 8 hour work day, not including time spent standing or walking about;  stand continuously for 1 hour before alternating postures, sitting, or lying down;  stand for 2 hours during an 8 hour work day, not including time spent sitting or lying down;  walk continuously for 30 minutes before alternating postures, sitting, or lying down;  walk for 1 hour during an 8 hour work day, not including time spent sitting or lying down;  could be on her feet either walking or standing for a total of 2 hours; could continuously lift 1-5 pounds; frequently lift 6-10 pounds; occasionally lift 11-20 pounds.;  never lift 21-50 pounds; could continuously carry 1-5 pounds; frequently carry 6-10 pounds; occasionally carry 11-20 pounds; and never carry 21-50 pounds.   (Tr. 163).  Dr. Hoyt also found that Plaintiff could use both hands for repetitive action and both feet for repetitive movements, as in operating foot controls.  (Tr. 164).  He also found that Plaintiff was able to occasionally bend, reach above head, and kneel, but could not squat, crawl, climb, stoop, or crouch at all.  (Tr. 164).  He concluded that Plaintiff could occasionally be around moving machinery;  be exposed to marked temperature changes;  drive automotive equipment;  be exposed to dust, fumes and gases;  and be exposed to noise, but not be exposed to unprotected heights at all.  (Tr. 164).  Dr. Hoyt found Plaintiff's pain was moderate to severe, that Plaintiff would sometimes need to take unscheduled breaks during an 8-hour working shift; that Plaintiff's impairments were likely to produce both good and bad days; and that Plaintiff was likely to be absent from work as a result of the impairments or treatment more than four days per month.  (Tr. 165).

On April 10, 2007, Plaintiff complained to Dr. Hoyt of problems swallowing and

-8-

problems with her right wrist. Dr. Hoyt noted that Cymbalta was helping her nerves a lot. Dr. Hoyt assessed Plaintiff with dysphasia;[7] tendonitis/right wrist; and right wrist ganglion cyst. (Tr. 182). On July 13, 2007, Plaintiff complained to Dr. Hoyt that she choked easily and that she still hurt. Dr. Hoyt assessed Plaintiff with dysphasia with [illegible]; anxiety/depression; [illegible]; and [illegible] OA. (Tr. 181). On August 28, 2007, Plaintiff reported to Dr. Hoyt that her stomach problems were much better and that her pain was much better with Roxicodone. Dr. Hoyt assessed Plaintiff with GERD; anxiety/depression, and osteoarthritis with chronic back syndrome. (Tr. 180).

On September 4, 2007, three views of Plaintiff's lumbar spine were taken at Sparks Medical Plaza. The impression was chronic disc disease at the level of L5-S1 with posterior spondylolisthesis of L5 on S1. (Tr. 168). Two views of the right knee revealed mild degenerative changes of the knee, and three views of the cervical spine revealed chronic disc disease at C5-C6 and C6-C7. (Tr. 168).

On September 17, 2007, Kathleen M. Kralik, Ph.D. conducted a Mental Diagnostic Evaluation. (Tr. 169-176). She indicated that the collateral information she received and reviewed was a medical note from November 13, 2006 by Dr. Hoyt, indicating Generalized Anxiety Disorder and chronic pain, along with grief issues and sleep problems associated with the death of her boyfriend. (Tr. 169). Dr. Kralik reported that Plaintiff received pain management many years from Dr. Lenington, who retired, so she now sees Dr. Hoyt. (Tr. 169). Dr. Kralik noted that Plaintiff alleged she became so depressed now that she had passive suicidal

---

[7]Dysphasia - Impairment of speech, consisting in lack of coordination and failure to arrange words in their proper order, due to a central lesion; called also dysphrasia and dysgrammatism. Id. at 587.

ideation. (Tr. 169). Plaintiff reported to Dr. Kralik that she had problems with depression all her life. (Tr. 170). Dr. Kralik noted that Plaintiff had somewhat of a history of physical altercations with others (especially females), and that she had an ordeal involving law enforcement with her children about ten years prior. (Tr. 170). Plaintiff told Dr. Kralik that she thought the Cymbalta worked the best among all the medications she had taken. (Tr. 170). Plaintiff also reported that she had been able to cut back on her Valium with the addition of the Roxicodone, and that Roxicodone worked better for the pain, but made her a little paranoid. (Tr. 170). Dr. Kralik diagnosed Plaintiff as follows:

| | | |
|---|---|---|
| Axis I: | V62.82 | Bereavement |
| | 307.89 | Pain Disorder Associated with both Psychological Factors and a General Medical Condition (rule out anxiolytic and/or narcotic abuse/dependency) |
| | 296.32 | Recurrent Major Depression, Moderate Severity, without Psychotic Features |
| | 309.4 | Adjustment Disorder with Mixed Disturbance of Emotions and Conduct (Increased social avoidance and failure to keep commitments; and "empty nest" issues) |
| | 314.01 | Attention Deficit Hyperactivity Disorder, combined type (Provisional) |
| Axis II: | 799.9 | Diagnosis on Axis II deferred (Histrionic, dependent and probably passive-aggressive personality features, at minimum) |
| Axis V: | Estimated Current GAF: | 51-60 |
| | Estimated Highest GAF Past Year - 61-70 | |
| | Estimated Typical GAF Past Year - 45-55 | |

(Tr. 174). Dr. Kralik further found that: Plaintiff's capacity to carry out activities of daily living and daily adaptive functioning was estimated to be intermittently and sometimes significantly impaired for occupational purposes; Plaintiff's capacity to communicate and interact in a socially adequate manner was estimated to be adequate for occupational purposes; Plaintiff's capacity to communicate in an intelligible and effective manner was estimated to be generally adequate

-10-

for occupational purposes;  Plaintiff's capacity to cope with the typical mental/cognitive demands of basic work-like tasks seemed somewhat impaired; but for the most part adequate for occupational purposes; Plaintiff's ability to attend and sustain concentration on basic tasks seemed intermittently impaired for occupational purposes; Plaintiff's capacity to sustain persistence in completing tasks seemed problematic; and Plaintiff's capacity to complete work-like tasks within an acceptable time frame seemed somewhat impaired for occupational purposes. (Tr. 175-176).  Noteworthy is Dr. Kralik's conclusion that malingering/exaggeration per se was not evident; "though she may have an exaggerated perception of her symptoms relative to those experienced by others under similar circumstances (i.e. In examiner's perception, claimant seemed here to be coping quite well relative to events over the last year)." (Tr. 176).  Dr. Kralik believed that Plaintiff's unreliability seemed to be the primary issue impacting Plaintiff's ability to engage in occupational endeavors; and an underlying ADHD-like condition could not be ruled out relative to the educational and functional information Plaintiff provided.  Dr. Kralik concluded: "Unless her medical records (regarding her back and pain issues) suggest otherwise, overall, claimant seems likely to perceive herself as more impaired (psychologically and physically) than might objectively be the case."  (Tr. 176).

On September 27, 2007, Dr. Hoyt assessed Plaintiff with: Allergic Rhinitis; GERD; OA/chronic LBS (lower back syndrome); and Lumbar disorder with radiculopathy.  (Tr. 179).

On September 28, 2007, Dr. Brad Williams prepared a Psychiatric Review Technique form.  (Tr. 191-204).  Dr. Williams found that Plaintiff had a mild degree of limitation in restriction of activities of daily living; moderate degree of limitation in difficulties in maintaining social functioning and concentration, persistence or pace; and no episodes of decompensation.

-11-

(Tr. 201). Dr. Williams noted that Plaintiff did not have a marked limitation in activities of daily living and that the evidence did not establish an impairment of sufficient severity to meet or equal a listing. He found that Plaintiff retained the ability to perform unskilled work. (Tr. 203).

Also on September 28, 2007, Dr. Williams completed a Mental RFC Assessment. (Tr. 205-208). He found Plaintiff was not significantly limited in 13 out of 20 categories; and was moderately limited in 7 out of 20 categories. (Tr. 205). He concluded that Plaintiff was able to perform work where interpersonal contact was incidental to the work performed, e.g. assembly work; the complexity of tasks was learned and performed by rote, with few variables and little judgment, and the supervision required was simple, direct and concrete - "Unskilled." (Tr. 207).

On October 23, 2007, Dr. Ronald Crow completed a Physical RFC Assessment. (Tr. 211-218). Dr. Crow found that Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 212). No postural, manipulative, visual, communicative or environmental limitations were established. Dr. Crow concluded that the medical records supported a "light RFC." (Tr. 217).

On January 21, 2008, Dr. Van Hoang conducted a General Physical Examination for the Social Security Administration. (Tr. 225-231). At that time, Plaintiff was taking Roxicodone, Valium, Cymbalta, and Flexeril. (Tr. 225). Plaintiff measured at 5'6" tall and weighed 205 pounds. (Tr. 227). Her range of motion in her spine and extremities were all normal; her gait and coordination were stable, and her limb function was 100%. (Tr. 228-229). Dr. Van Hoang

-12-

diagnosed Plaintiff with: chronic low back pain - post spinal surgeries x 3; chronic neck pain - cause to be determined; and chronic right knee pain - cause to be determined.  (Tr. 231).  He reported Plaintiff had "moderate physical limitation for employment."  (Tr. 231).  Three views of Plaintiff's lumbar spine taken on January 21, 2008, revealed chronic disc disease L5-S1 - unchanged since 9/4/07.  (Tr. 232).

On August 8, 2008, Plaintiff presented herself to Sparks Regional Medical Center, and the reason given for her visit was reported as back pain, "neck structure," and muscular pain/spasm in her right shoulder.  (Tr. 395).  X-ray results revealed no acute cardiopulmonary disease, degenerative changes of the cervical and thoracic spine with no acute osseous abnormality, and no acute osseous abnormality of the right shoulder or right scapula.  (Tr. 407-408).  Plaintiff was diagnosed with thoracic pain.  (Tr. 400).

On September 25, 2008, an altercation between the maintenance man, his wife and Plaintiff ensued at Plaintiff's apartment, during which the maintenance man and his wife beat and kicked Plaintiff.  (Tr. 32).  Plaintiff presented to Sparks Regional Medical Center, complaining of pain in her head, arm, and leg.  (Tr. 472).  The impression of Plaintiff's injuries was: no acute intracranial abnormality;  bilateral nasal bone fracture without significant displacement;  fracture involving left orbital floor which may be due to previous injury as there is no fluid in the left maxillary sinus.  A significant degree of left periorbital soft tissue swelling/hematoma was present.  (Tr. 486).

On October 8, 2008, Plaintiff saw Dr. Hoyt, who assessed Plaintiff with:  fracture of facial bones; fracture orbit: GERD; Failed back syndrome; Osteoarthritis; [illegible].  (Tr. 488).

In an undated Disability Report - Adult, Plaintiff reported that when she got up in the

-13-

morning, it took her an hour or two to "get moving. Or I'm drugged down from the medication."
(Tr. 113). She reported that she stopped work on May 17, 1992, because the pain got so hard to
bear, her ankles would swell up if she was on her feet for a period of time, and her knee would
give out on her and she fell. (Tr. 113). In an Undated Disability Report - Appeal, Plaintiff
reported that her pain increased, her range of motion decreased, and that she gained weight. (Tr.
125). She further reported that she was dependent on friends and family for nearly all aspects
of daily living, i.e. cooking, cleaning, laundry, grocery shopping, and yard work. (Tr. 128).

At the hearing held on November 18, 2008, Plaintiff reported that Dr. Hoyt gave her
injections as she needed them, and that her chief complaint of pain was in her low back and neck.
(Tr. 12). She stated that she had spinal injections by Dr. Lenington on a regular basis for her
back pain, and that they worked. (Tr. 13). She further stated that after so long, "they don't like
to give them to you because they deteriorate the spine." (Tr. 13). She testified that since the
injections stopped, she had been on several different medications. (Tr. 16). She stated that the
pain started in her lower back and "shoots up" through her neck, into her shoulders, down into
her hip, leg, and her toes. (Tr. 17). Plaintiff stated that the Roxicodone helped the pain but that
she still hurt and did not sleep well. (Tr. 17). She also stated that she had problems with her
knees and ankles. (Tr. 19). She stated that the Flexeril helped her joint pain "a little bit." (Tr.
20). Plaintiff testified that Dr. Hoyt had been treating her for depression for about five years and
that at that time, she was on Cymbalta. (Tr. 25). She did not know if she felt better - she was
still depressed and had panic attacks. (Tr. 26). She stated that her children helped her around
the house, cooked for her and cleaned the apartment. (Tr. 27). She also stated that she had to
be reminded of things and could not stay focused. (Tr. 31). She testified that she knew how to

-14-

read and write, could add and subtract, and keep up with her bills.  (Tr. 33-35).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for

-15-

at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC). See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

## IV.   Discussion:

Plaintiff raises the following grounds on appeal: 1) The ALJ erred as it relates to her findings of severe impairments; 2) The ALJ failed to develop the record as to the Plaintiff's RFC; 3) The ALJ improperly discounted the Plaintiff's subjective complaints of pain; 4) The ALJ erred as it relates to her assessment of credibility; and 5) The ALJ largely ignored the Plaintiff's limitations set out in the RFC of the Plaintiff's primary care physician. (Doc. 11).

## A.   Severe Impairments:

Plaintiff contends that the ALJ ignored Plaintiff's long-standing treatment for fibromyalgia, PTSD, GAD, knee and ankle disorders, osteoarthritis, depression, and a shoulder disorder.

With respect to the fibromyalgia, the ALJ concluded that the evidence did not confirm

-16-

this as a medically determinable impairment.  The only physician that diagnosed Plaintiff with fibromyalgia was Dr. Hoyt, and even though Plaintiff saw Dr. Hoyt numerous times between January of 2006 through 2008, the fibromyalgia diagnosis was only made by him on January 5, 2006 and May 22, 2006.  On January 5, 2006, Plaintiff complained to Dr. Hoyt that her ankles swelled if she was on her feet too long and that she was falling more and her knees were buckling.  Plaintiff complained of left ankle swelling on May 22, 2006, and Dr. Hoyt reported she had recurrent swelling and soreness of her ankle.  These records do not give a basis for Dr. Hoyt's diagnosis of fibromyalgia, or reflect that the usual testing for fibromyalgia was performed by Dr. Hoyt.  Furthermore, no other physician, either examining or non-examining, diagnosed Plaintiff with fibromyalgia .  "A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record."  Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir.2003), paraphrasing 20 C.F.R. § 404.1527(d)(2).  The Court believes that there is substantial evidence to support the ALJ's conclusion that the evidence did not support Dr. Hoyt's diagnosis of fibromyalgia.

Regarding PTSD, GAD, and depression, the ALJ carefully analyzed Plaintiff's mental impairment allegations, concluding that considered singly and in combination, they did not meet or medically equal the criteria of listings in 12.04 and 12.06.  The ALJ concluded that Plaintiff had no restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation.  This conclusion was consistent with the findings Dr. Brad Williams gave in his Psychiatric Review Technique, except that Dr. Williams did find Plaintiff had a mild degree

-17-

of limitation in restriction of activities of daily living.  Dr. Williams concluded that the evidence did not establish an impairment of sufficient severity to meet or equal the listings, and that Plaintiff retained the ability to perform unskilled work.  In addition, although Dr. Kralik, an examining mental health specialist, found Plaintiff's capacity to carry out activities of daily living and daily adaptive functioning was estimated to be intermittently and sometimes significantly impaired for occupational purposes, she also believed Plaintiff may have an exaggerated perception of her symptoms relative to those experienced by others under similar circumstances.  The Court recognizes that Dr. Hoyt concluded in his Medical Source Statement of Ability to do Work-Related Activities(Mental) that Plaintiff had "Poor" ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual.  However, Dr. Hoyt  specializes in family medicine, whereas Dr. Kralik is a mental health specialist.  See Brown v. Astrue, 611 F.3d 941, 952 (8th Cir. 2010)(holding that "[g]reater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist")(citations omitted)).

Finally, Plaintiff did not initially allege that her mental impairments were disabling impairments.  See Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994)(finding it noteworthy that Plaintiff did not allege a disabling mental impairment in her application for disability benefits).

With respect to Plaintiff's knee and ankle disorders, osteoarthritis and shoulder disorder, although Plaintiff complained of such disorders at various times, there is no evidence that these impairments were severe or that they would significantly limit Plaintiff's ability to do basic

-18-

work activities.  On August 8, 2008, diagnostic testing revealed that Plaintiff's right shoulder

did not have an acute fracture, subluxation, or dislocation.  (Tr. 407).  An x-ray of Plaintiff's

right knee taken on September 4, 2007, revealed mild degenerative changes.  (Tr. 168).

Regarding Plaintiff's osteoarthritis, the medical records did not indicate the severity of her OA.

Based upon the foregoing, the Court finds there is substantial evidence to support the

ALJ's finding that the only severe impairment is Plaintiff's degenerative disc disease.

**B.      Subjective Complaints and Credibility Analysis (Grounds 3 and 4 of appeal):**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective

complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily

activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and

aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5)

functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an

ALJ may not discount a claimant's subjective complaints solely because the medical evidence

fails to support them, an ALJ may discount those complaints where inconsistencies appear in

the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a

claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314

F.3d 964, 966 (8th Cir. 2003).

In this case, the ALJ found that after careful consideration of the evidence, Plaintiff's

medically determinable impairments could reasonably be expected to cause the alleged

symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting

effects of these symptoms were not credible to the extent they were inconsistent with the RFC

assessment.  In making this finding, the ALJ noted that consultative examination showed

-19-

normal range of motion with no swelling, normal pulses and normal limb function, and that the records continued to show Plaintiff's condition as stable and well controlled with medications. The ALJ found that the treating physician's opinions were overly narrow and not consistent with the objective medical treatment and his treatment records or with the consultative examinations. She also found that the mental limitations given by the treating physician's opinion were not consistent with his own notes or the consultative examination. Accordingly, the ALJ discounted them.

With respect to Plaintiff's daily activities, Plaintiff reported that her family basically did everything for her - including cooking, cleaning, and doing laundry. However, the Court does not believe the medical evidence supports Plaintiff's description of her limitations. Again, it is noteworthy that Dr. Kralik gave Plaintiff a GAF of 51-60, and stated that Plaintiff "may have an exaggerated perception of her symptoms relative to those experience by others under similar circumstances." Dr. Kralik further found that overall, Plaintiff seemed "likely to perceive herself as more impaired (psychologically and physically) than might objectively be the case." Even though a claimant alleges limited activities, the ALJ does not have to believe the claimant, as the ALJ is in the better position to assess credibility. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

As to Plaintiff's subjective complaints of pain, the record reflects that the ALJ properly considered the medication and treatment Plaintiff received since her back surgeries, and that no further aggressive treatment was recommended. The ALJ also considered Plaintiff's daily activities and concluded that the medical evidence did not support Plaintiff's description of her limitations. In addition, Dr. Kralik's findings indicate that Plaintiff's subjective complaints

-20-

appeared to be more extreme than the objective evidence indicates.  In light of this, as well as the findings of the examining and non-examining physicians, the Court believes there is substantial evidence to support the ALJ's credibility findings.

## C.    RFC Assessment:

RFC is the most a person can do despite that person's limitations.   20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  Guilliams, 393 F.3d at 801;  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).   "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

The ALJ found that Plaintiff retained the RFC to perform light work with certain limitations.  In making this finding, the ALJ stated that she considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  She also considered opinion evidence in accordance with the relevant regulations.  The ALJ noted that Plaintiff's degenerative disc disease remained unchanged since September 2007, that consultative examination showed normal range of

AO72A
(Rev. 8/82)

motion with no swelling, normal pulses and normal limb function, that the examination performed in January of 2008 showed only moderate limitations, that the record from September 2007 showed no fibromyalgia, that records continued to show Plaintiff's condition was stable and well controlled with medications and that the August 2008 report showed no functional limitations.

In her decision, the ALJ did not indicate in the RFC that Plaintiff was limited to "unskilled" work.  She instead stated that Plaintiff "should not have transactional interaction with the public." (Tr. 53).  However, as discussed below, in her hypothetical question proposed to the VE, the ALJ did specify that Plaintiff was limited to unskilled work.  Accordingly, the Court believes there is substantial evidence to support the ALJ's RFC assessment.

**D.      Hypothetical Question to VE:**

In her hypothetical question to the VE, the ALJ stated:

> I'm going to give you an RFC for an individual ...capable of a full range of unskilled, light work with frequent postural limitations, meaning specifically frequent balancing, stooping, kneeling, crouching, crawling and climbing of ramps and stairs.  No ladders, ropes or scaffolding.  Only occasional exposure to workplace hazards.  No work at heights.  Only frequent exposure to airborne irritants and no transactional interaction with the public.  Assume a hypothetical claimant with the same vocational profile and RFC as the claimant, are there any unskilled occupations such an individual could perform?

(Tr. 36-37).  In response, the VE stated that the positions of unskilled machine tenders, unskilled assemblers, and unskilled poultry workers would be available.

The Court believes the hypothetical question the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  The Court further believes that

-22-

the VE's responses to the hypothetical question constitutes substantial evidence supporting the

ALJ's conclusion that Plaintiff's impairments did not preclude her from performing light work

with certain limitations as a machine tender, assembler, and poultry worker.  Pickney v. Chater,

96 F.3d 294, 296 (8th Cir. 1996)(testimony from VE based on properly phrased hypothetical

question constitutes substantial evidence).

**V.       Conclusion:**

Accordingly, the Court hereby affirms the ALJ's decision and dismisses Plaintiff's case

with prejudice.

DATED this 6th day of March, 2012.

/s/ *Erin L. Setser*
_____

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)